| | | |
|---|---|---|
| RUSSELL DEAN, INC. d/b/a/ GARLOCK CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 8440 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JOHN MAHER, RICHARD GARZA, and | ) | |
| CHICAGOLAND ROOFING SUPPLY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Russell Dean, Inc., which does business under the name Garlock Chicago, sued two of its former employees, Richard Garza and John Maher, and their new company, Chicagoland Roofing Supply, LLC ("CRS"), for unlawfully appropriating Garlock's inventory, trade secrets, and customers. Doc. 1. Despite having been timely served, Docs. 12-14, Defendants filed no responsive pleading and the court entered a default against them under Civil Rule 55(a), Doc. 15. The court then denied their Rule 55(c) motions to vacate the default. Docs. 48-49, 84.

Garlock now moves for entry of a default judgment under Rule 55(b). Doc. 23. By failing to respond, CRS forfeits any arguments in opposition it might have had, so Garlock's motion is granted as to it. As to Maher and Garza, the motion is granted in part and denied in part.

**Background**

Upon the entry of default, "the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012); *see* Fed. R. Civ. P. 8(b)(6) ("An allegation— other than one relating to the amount of damages—is admitted if a responsive pleading is

required and the allegation is not denied.").  Under Rule 10(c), "written instruments attached as exhibits" to the complaint, including "contracts," "are incorporated into the pleadings."  *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998) (internal quotation marks omitted).  "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."  *Id.* at 454.

The facts supported by the complaint's well-pleaded factual allegations, and those supported by the evidence Garlock adduces to support its Rule 55(b) motion, Docs. 24-25, are set forth below.  Maher's opposition brief makes certain factual assertions, Doc. 71 at 2, but because he does not support those assertions with evidence, they are disregarded.  *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence … ."); *In re Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("Arguments and factual assertions made by counsel in a brief, unsupported by affidavits, cannot be given any weight.").

Garlock is a roofing supply company that operates a distribution facility in Bensenville, Illinois.  Doc. 1 at ¶¶ 3-5.  Garza and Maher were both Garlock employees: Garza from April 3, 2006 to July 29, 2017, and Maher from May 2, 2011 to August 8, 2016.  *Id.* at ¶¶ 13, 15.  Garza was responsible for day-to-day operations of the Bensenville facility, and Maher was responsible for cultivating business in his sales territory.  *Id.* at ¶¶ 14, 16.  Both were entrusted with Garlock's confidential information and unrestricted access to its inventory.  *Id.* at ¶¶ 17-20, 41. Both were provided access to Garlock's lists of customers, many of which were long-time customers that Garlock developed at great cost and effort.  *Id.* at ¶¶ 18-19.

When they began their employment, Garza signed a non-solicitation agreement with Plymouth Industries, Inc., Doc. 1-2—an entity not referenced in the complaint—and Maher signed a non-solicitation agreement with Garlock, Doc. 1-3.  The agreements required Garza and

Maher, respectively, to refrain working for a competitor or interfering with his employer's business, not only during his employment, but also for up to six months (Garza) or one year (Maher) after his employment terminated.  Doc. 1-2 at ¶ 2 (Garza); Doc. 1-3 at ¶ 2 (Maher).  The agreements also prohibited indefinitely the unauthorized use and disclosure of Plymouth's (Garza) and Garlock's (Maher) information and materials.  Doc. 1-2 at ¶¶ 1, 5; Doc. 1-3 at ¶¶ 1, 5.  Finally, the agreements prohibited Defendants from investing in any competitor during their employment and for one year after leaving Plymouth (Garza) or Garlock (Maher).  Doc. 1-2 at ¶ 6; Doc. 1-3 at ¶ 6.

Defendants also signed the Plymouth code of conduct, Doc. 1-4 at 4-7 (Garza), 8-11 (Maher), and the Garlock code of conduct, *id*. at 1-3 (Garza); Doc. 1 at ¶ 31 (Maher).  The codes of conduct do not restrict post-employment competition, but do provide that employees should not own a significant financial interest (both codes) or be involved in (Plymouth's code) any competing business.  Doc. 1-4 at 2, 5, 9.  The codes also prohibit employees from buying assets from or selling assets to their employer or its subsidiaries unless the transaction is fully disclosed and approved by management.  *Ibid*.

In August 2016, Maher left Garlock's employ and became an independent sales representative.  Doc. 1, ¶¶ 37, 39; Doc. 1-5.  Maher's independent sales representative agreement with Garlock prohibited him from marketing competitors' products or services.  Doc. 1 at ¶ 38; Doc. 1-5.  Around the time Maher became an independent sales representative, he and Garza formed CRS, a competing roofing supply company.  Doc. 1 at ¶ 40.  While the pair remained affiliated with Garlock, Garza used Garlock's equipment to solicit customers for CRS and, along with Maher, invoiced CRS's customers for inventory taken from Garlock.  *Id*. at ¶¶ 40-43; Doc. 24 at ¶¶ 6-8; Doc. 25 at ¶ 6.  To create the invoices, Defendants placed the CRS logo over

Garlock's logo on Garlock's invoice form. Doc. 1 at ¶ 42; Doc. 24 at ¶ 8. Defendants used their access to Garlock's inventory and confidential information to build CRS's business, and when they sold Garlock inventory on CRS's behalf, Garlock did not receive payment. Doc. 1 at ¶¶ 40-44, 53, 56, 59, 103. Between July 28, 2016—approximately when CRS was formed—and the termination of Defendants' respective affiliations with Garlock in July 2017, Doc. 1-6 at 1, 3, Garlock paid Maher $15,616.57 ($3,082.34 as an employee and $12,534.23 as an independent sales representative) and Garza $109,306.53, Doc. 25 at ¶ 18.

After Garza left Garlock, Trenton Perron, Garlock's director of equipment, discovered invoices and other communication that Garza had sent on CRS's behalf using Garlock's systems. Doc. 24 at ¶¶ 1, 6; Doc. 24-1. Upon finding a handwritten list of over $49,000 in inventory, Doc. 24-4, Perron contacted Maher, who agreed to remit payment for that amount, Doc. 24 at ¶ 9. After later discovering additional Garlock inventory that he believed to be in Maher's possession, Perron again contacted Maher, who agreed to remit payment for some of those items as well. *Id.* at ¶ 10; Doc. 24-5; *see also* Doc. 24-8 at 8 (Garlock's invoice to Maher for those items). Perron also concluded that other large items missing from Garlock's inventory—two Rockers and a Uniroof—had serial numbers matching those listed on CRS invoices. Doc. 24 at ¶¶ 11, 13; Doc. 25 at ¶¶ 15-16; Doc. 24-7; Doc. 24-9. Given all this, Garlock sent Maher invoices totaling $103,380.21 for missing inventory, which Maher has not paid. Doc. 24 at ¶ 12; Doc. 24-8.

An inventory count of Garlock's Bensenville facility conducted when Garza left Garlock showed $128,582 of high-value inventory missing. Doc. 1 at ¶ 46; Doc. 24 at ¶ 13. The average year-end inventory shortfall at the Bensenville facility was $9,044 from 2011 through 2015. Doc. 25 at ¶ 14; Doc. 25-2.

CRS's formation coincided with diminished revenue from sales accounts that Garlock assigned to Maher. Doc. 1 at ¶ 50. Jeff Peterson, Garlock's chief financial officer, performed an analysis comparing the performance of Maher's accounts in 2016 and 2017. Doc. 25 at ¶¶ 1, 7. Peterson found that those accounts generated $1,038,631 less in sales in 2017, and $510,733 less in net revenues, than anticipated by Garlock's projections. *Id.* at ¶¶ 8, 10; Doc. 25-1. And since they left Garlock, Garza and Maher have competed with Garlock, solicited its customers, and falsely reported to customers that Garlock is going out of business. Doc. 1 at ¶¶ 48-49, 71; Doc. 24 at ¶ 15.

The complaint asserts twelve causes of action: breach of contract (Count I); conversion of inventory (Count II); conversion of trade secrets (Count III); intentional (Count IV) and negligent (Count V) interference with actual and prospective economic advantage; breach of fiduciary duty (Count VI); civil conspiracy (Count VII); misappropriation of trade secrets (Count VIII); unfair competition (Count IX); statutory replevin (Count X); unjust enrichment (Count XI); and slander (Count XII). Doc. 1 at ¶¶ 52-112. The complaint seeks to enjoin Defendants from soliciting Garlock customers whom they know by virtue of their affiliation with Garlock, and from using or transmitting any confidential information that they gained while at Garlock. *Id.* at p. 21, ¶ A. Garlock also seeks damages, interest, attorney fees, and costs, along with an order compelling the return and preventing the concealment or impairment of records and information pertaining to Garlock's business, requiring Defendants to provide an accounting of all customer contacts since Maher ended his employment, and compelling Defendants to retract their defamatory statements. *Id.* at pp. 21-22, ¶¶ B-C, E-G.

**Discussion**

"[T]here are two stages in a default proceeding: the establishment of the default [under Rule 55(a)], and the actual entry of a default judgment [under Rule 55(b)]. Once the default is established, and thus liability, the plaintiff still must establish [its] entitlement to the relief [it] seeks." *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (internal quotation marks omitted); *see also In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004) (holding that damages awarded in a default judgment must be ascertained "with reasonable certainty") (internal quotation marks omitted). "The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint" to establish any particular cause of action, *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994), or the causation or calculation of damages, *see Wehrs*, 688 F.3d at 892. Whether to grant a default judgment is within the court's discretion. *See Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014).

Garlock seeks $901,526.31 in damages: (1) $510,733 in lost profits; (2) $265,880.21 in missing inventory; and (3) $124,913.10 for compensation that it paid to Maher and Garza since they formed CRS. Doc. 23 at 19, 22-23. Garlock also seeks an injunction prohibiting Defendants from directly or indirectly: "(i) soliciting or attempting to solicit any Garlock customer serviced by Defendants at Garlock or whose names became known to Defendants by virtue of Garza's and Maher's employment with Garlock; and (ii) using, disclosing or transmitting for any purpose Garlock's documents, materials and or Confidential Information pertaining to Garlock, Garlock's employees, and/or Garlock's customers." *Id*. at 31. Garlock seeks its attorney fees as well. *Ibid*.

In opposing this relief, Garza and Maher contend only that the complaint's well-pleaded factual allegations do not establish any of Garlock's causes of action; they do not submit any

evidence contradicting the evidence Garlock adduced to support its Rule 55(b) motion. Docs. 70-71. Accordingly, the parties dispute only whether the complaint's well-pleaded factual allegations establish liability and, if so, whether those allegations, together with Garlock's evidentiary submissions, establish its right to damages and injunctive relief.

## A. Injunctive Relief

Garlock's request for injunctive relief rests on its claim that Garza and Maher breached the restrictive covenants in the codes of conduct and non-solicitation agreements. Doc. 23 at 25-27. A party seeking injunctive relief must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by" an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1. Garza's Non-Solicitation Agreement

Garza argues that Garlock cannot enforce the non-solicitation agreement against him because Plymouth Industries, not Garlock, is the employer named in the agreement. Doc. 70 at 4-7. Garza's factual premise is correct—although the complaint alleges that Garza and *Garlock* were parties to his non-solicitation agreement, Doc. 1 at ¶¶ 21-23, 31, the agreement itself lists *Plymouth* as the counterparty, Doc. 1-2 at 1, and the agreement controls over inconsistent allegations in the complaint. *See N. Ind. Gun & Outdoor Shows*, 163 F.3d at 454. That leaves the legal question whether Garlock nevertheless may enforce the agreement.

"Generally, one who is not a party to a contract may not recover for its breach." *Nat'l Cash Register Co. v. UNARCO Indus., Inc.*, 490 F.2d 285, 286 (7th Cir. 1974). There are exceptions to this rule for third-party beneficiaries and those in privity with a contractual party.

*See Johnson Bank v. George Korbakes & Co., LLP*, 472 F.3d 439, 441 (7th Cir. 2006) ("To be a third-party beneficiary of a contract is to have the rights of a party, which is to say the power to sue to enforce the contract."); *Kaplan v. Shure Brothers, Inc.*, 153 F.3d 413, 418 (7th Cir. 1998) ("Under Illinois law, a cause of action based on a contract may only be brought by a party to that contract or someone in privity with that party."). But the agreement does not even mention Garlock, let alone suggest that it is in privity with Plymouth or a third-party beneficiary, and the complaint does not mention Plymouth either. Thus, although Garza's default resulted in his admitting the complaint's well-pleaded allegations, those allegations do not establish Garza's liability to Garlock for breaching the Plymouth non-solicitation agreement. *See Sullivan v. DSSA Mgmt., Inc.*, 2004 WL 1375524, at *2 (N.D. Ill. June 18, 2004) ("[I]f the documents Sullivan attached to his Complaint did in fact contradict his claims, this could be grounds for challenging the sufficiency of the complaint and, necessarily, the underlying default judgment.").

Garlock argues that the court should conduct a hearing under Rule 55(b)(2)(C) or (D) to allow it to establish that it is in privity with Plymouth and therefore entitled to enforce Garza's non-solicitation agreement. Doc. 80 at 25-26. Rule 55(b)(2) authorizes the court to "conduct hearings … when, to enter or effectuate [a default] judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). Whether to hold a Rule 55(b)(2) hearing is committed to the court's discretion. *See Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).

The court in its discretion declines to hold such a hearing. A hearing under Rule 55(b)(2)(C) or (D) is an uneasy fit where the plaintiff seeks to correct "otherwise fatal defects in the pleadings" in order to establish liability on a cause of action. *Nishimatsu Constr. Co., Ltd. v.*

*Houston Nat'l Bank*, 515 F.2d 1200, 1206 n.5 (5th Cir. 1975); *see also Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 500 (5th Cir. 2015) (distinguishing the correction of fatal defects from the addition of factual details that flesh out a sufficiently supported claim). Yet that is precisely what Garlock proposes to do—use the hearing to establish that it may enforce Garza's non-solicitation agreement, even though nothing in the pleadings indicates that it is in privity with Plymouth. The court therefore declines to hold a Rule 55(b)(2) hearing to allow Garlock to adduce facts that would extend Garza's liability for causes of action not established by the complaint's well-pleaded allegations. *See WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 606 (7th Cir. 2008) (explaining that the pleadings limit the relief that can be granted in a default judgment).

### 2. Maher's Non-Solicitation Agreement

Maher's non-solicitation agreement, unlike Garza's, is with Garlock, not Plymouth. Doc. 1-3 at 1. Maher's formation of CRS, solicitation of Garlock customers, and unauthorized use of Garlock's confidential information and sale of its property violated various provisions in that agreement. Doc. 1 at ¶¶ 39-44, 53, 101, 103; Doc. 1-3 at ¶¶ 2, 5-7. The question, then, becomes whether Garlock is entitled to injunctive relief to enforce the agreement.

Illinois law provides that only reasonable restrictive covenants may be enforced. *See Instant Tech. LLC v. DeFazio*, 793 F.3d 748, 750 (7th Cir. 2015) ("In Illinois a restrictive covenant in an employment agreement is valid only if it serves a legitimate business interest.") (internal quotation marks omitted); *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000) ("[T]he question of whether a restrictive covenant is enforceable or not is a question of law. … [B]ecause Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized.") (alterations and internal quotation marks omitted). "For a restrictive covenant to

be reasonable, its terms (1) must not be greater than necessary to protect [the employer], (2) must not be oppressive to [the employee], and (3) must not be injurious to the general public." *Id*. at 987; *see also Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 400 (Ill. 2011) (describing the reasonableness test as based on "the totality of the circumstances of the particular case") (internal quotation marks omitted). Restrictive covenants without temporal or geographic restrictions are generally unreasonable and thus unenforceable. *See Liautaud*, 221 F.3d at 987-88; *Bus. Records Corp. v. Lueth*, 981 F.2d 957, 960 (7th Cir. 1992) (noting that the reasonableness of a restrictive covenant is assessed by the "time, geographical area, and scope of prohibited business activity" that it covers) (internal quotation marks omitted).

Maher's agreement prohibited him, both during his employment and for one year thereafter, from (i) diverting or attempting to divert business from Garlock; (ii) interfering with Garlock's business prospects; (iii) employing or attempting to entice away Garlock employees; and (iv) investing in any company competing with Garlock. Doc. 1-3 at ¶¶ 2, 6. Another provision prohibited Maher from retaining or distributing "materials related to [Garlock's] business" and from using "the information contained in them," regardless of whether the materials and information were confidential. *Id*. at ¶ 5. Neither provision includes a geographic restriction. *Id*. at ¶¶ 2, 5. So, as written, the agreement prohibited Maher for one year from forming, investing in, or working for a competing business anywhere in the world, and also indefinitely from using or distributing any information obtained at Garlock.

Because the extremely broad range of activities prohibited by the agreement goes beyond the reasonable protection of Garlock's business interests, the agreement is unenforceable as written. *See Liautaud*, 221 F.3d at 987-88 (rejecting as unreasonable a restrictive covenant that prevented competition "anywhere in the world"—regardless of whether "trade secrets" were

used—and restricted the employee's activities "for the rest of his life"); *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. 1999) ("Courts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not those whose effect is to prevent competition *per se*.") (internal quotation marks omitted). This does not defeat Garlock's effort to enforce the agreement, however, for "[u]nder Illinois law, a court, at its discretion, may modify or 'blue pencil' an unreasonable agreement in order to make it comport with the law, or sever unenforceable provisions from a contract." *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 718 (N.D. Ill. 2014) (citing *Arpac Corp. v. Murray*, 589 N.E.2d 640, 652 (Ill. App. 1992); *Corroon & Black of Ill., Inc. v. Magner*, 494 N.E.2d 785, 793 (Ill. App. 1986)); *see also Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 666 (N.D. Ill. 1989) (noting that "the fairness of the restraints imposed in the written agreement is a relevant consideration" in deciding whether to modify it) (citing *House of Vision, Inc. v. Hiyane*, 225 N.E.2d 21, 25 (Ill. 1967); *N. Am. Paper Co. v. Unterberger*, 526 N.E.2d 621, 625 (Ill. App. 1988)); *see also Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1019 (7th Cir. 2013) (Hamilton, J., concurring) (noting that Illinois law affords courts the discretion "to salvage unreasonable covenants by judicial modification"); *cf. Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 529 (Ill. App. 2007) (noting that "extensive judicial reformation of blatantly unreasonable posttermination restrictive covenants may be against public policy").

It is appropriate to exercise that discretion here. As an initial matter, the agreement includes a severability clause that expressly contemplates judicial modification in the event its covenants are held overbroad. Doc. 1-3 at ¶ 10 ("If a court of competent jurisdiction determines that any … restriction is overbroad or unreasonable, the court may modify such overbroad or unreasonable restriction to render it reasonable and enforceable. Each of the terms of this

Agreement is severable in whole or in part … ."); *see Trailer Leasing Co. v. Assocs. Commercial Corp.*, 1996 WL 392135, at *1 (N.D. Ill. July 10, 1996) (explaining that, in deciding whether to blue pencil a restrictive covenant, "the fairness of the original restraint … is less important if the covenant contains a severability clause") (citing *Wyatt v. Dishong*, 469 N.E.2d 608, 610 (Ill. App. 1984)).  Moreover, and perhaps recognizing the agreement's overbreadth, Garlock prays for injunctive relief narrower than that contemplated by the agreement's broad terms: Garlock seeks to prohibit Maher, for a six-month period, from (i) soliciting its customers and potential customers who became known to him by virtue of his employment, and (ii) using or distributing documents, materials, and confidential information relating to its business.  Doc. 23 at 30-31; Doc. 80 at 24.  The court will consider those requests in turn.

First, Garlock seeks to restrict Maher from soliciting any customer or potential customer that became known to him "by virtue of" his employment at Garlock.  Doc. 23 at 31.  Garlock has a protectable interest in retaining long-term customer relationships based on confidential information that it shared with Maher.  Doc. 1 at ¶¶ 18-20 ("Garlock spent substantial resources in gaining knowledge about its customers and protecting the privacy of such information. Garlock customers typically remain with and continue to be serviced by [Garlock] … .  But for their employment with Garlock, Defendants would not have known the identity of Garlock's customers."); *see Reliable Fire Equip.*, 965 N.E.2d at 403 (noting that courts should consider the "near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions" in deciding whether a "legitimate business interest exists") .  At the same time, "[c]ourts are hesitant to enforce noncompetition agreements that prohibit employees from soliciting or servicing not only

customers with whom they had contact, but also customers they never solicited or had contact with while employed." *Eichmann*, 719 N.E.2d at 1147.

To honor the reasonableness requirement of Illinois law—and to appropriately balance Garlock's interest in protecting its client base, Maher's interest in developing a new enterprise, and the public's interest in competition—the court will limit injunctive relief to Maher's solicitation of customers that he serviced while a Garlock employee. *See Hanchett Paper Co. v. Melchiorre*, 792 N.E.2d 395, 403 (Ill. App. 2003) (holding that enforcing a broad restrictive covenant only as to customers that the former employee "serviced" does not impermissibly "rewrite the contract") (internal quotation marks omitted). This restriction generally aligns with the conduct of which Garlock complains. Doc. 1 at ¶¶ 19-20, 48-49, 65 (focusing on Maher's involvement with Garlock's customers); Doc. 24 at ¶ 15 ("Maher and Garza continue to operate CRS and continue to aggressively solicit customers away from Garlock."). Although this restriction is not confined to a defined geographic area, limiting the injunction to customers that Maher serviced renders unnecessary any geographic constraint. *See Eichmann*, 719 N.E.2d at 1147-48 ("The lack of a geographic restriction does not automatically invalidate a postemployment restraint where the geographical prohibition is qualified by an activity restraint.") (emphasis omitted).

Second, Garlock seeks to restrict Maher from using or disclosing documents, materials, and confidential information that he gained as a Garlock employee. Doc. 23 at 31. Garlock "has a legitimate business interest in restraining" Maher "from appropriating" Garlock's "confidential trade information." *Reliable Fire Equip.*, 965 N.E.2d at 401. However, Garlock does not have a legitimate interest in protecting *non*-confidential information: "Since employment nondisclosure agreements affect a State interest, that is, the free flow of information necessary for commercial

competition, they are enforceable only if … the information which they seek to protect is in fact confidential." *N. Am. Paper Co.*, 526 N.E.2d at 624. The court thus will enforce the non-disclosure provision only to the extent it restrains Maher from using confidential information obtained from Garlock to compete with Garlock. Doc. 25 at ¶ 6 ("Maher and Garza continue to operate CRS in competition with [Garlock], and they continue to use Confidential Information to solicit customers.").

Finally, Garlock requests an extension of the agreement's time-limited provisions. Doc. 23 at 30. Maher left Garlock's employ in August 2016, so many of the agreement's restrictions expired by their terms in August 2017. Doc. 1-3 at ¶¶ 2, 6; Doc. 1 at ¶ 37. Garlock asks that those restrictions be imposed now, for a period of six months, due to Maher's "continuous" violations since August 2016. Doc. 23 at 30; Doc. 80 at 24. That request is eminently sensible.

Restrictive covenants are strictly construed, but there are "certain instances" where they may be extended. *Citadel Inv. Grp., LLC v. Teza Techs. LLC*, 924 N.E.2d 95, 104 (Ill. App. 2010). Maher's willful violation of the restrictive covenants and failure to inform Garlock of his activities on CRS's behalf, Doc. 1 at ¶¶ 39-44, 103; Doc. 1-3 at ¶ 7; his unauthorized sale of Garlock inventory without payment or attribution to Garlock, Doc. 1 at ¶¶ 42-44, 56, 103; the resulting confusion among customers regarding Garlock and CRS, Doc. 1 at ¶¶ 42-43, 109; Doc. 24 at ¶ 7; Garlock's relatively prompt action upon learning of his violations, Doc. 1 at ¶¶ 46, 51; Doc. 24 at ¶¶ 6, 8; and his continued solicitation of Garlock customers, Doc. 1 at ¶¶ 48-49; Doc. 24 at ¶ 15, warrant applying the restrictions for a fresh six-month period. *See Elec. Support Sys., Inc. v. Schattke*, 388 N.E.2d 787, 789 (Ill. App. 1979) (holding that "in certain instances injunctive relief might be appropriate even after the expiration of the contractual period"). This result provides Garlock with some of "the agreed-upon period of noncompetition" that it

bargained for and would have received had Maher "not competed in violation of his agreement." *Prairie Eye Ctr., Ltd. v. Butler*, 768 N.E.2d 414, 424 (Ill. App. 2002).

Finally, Garlock has satisfied the general requirements of injunctive relief. *See eBay Inc.*, 547 U.S. at 391. The restrictions in Maher's agreement establish a clearly ascertainable right against infringement of Garlock's business interests. The agreement's express authorization of injunctive relief, Doc. 1-3 at ¶ 11 ("[Garlock] shall be entitled to injunctive relief for any breach or threatened breach of this Agreement in addition to any other rights or remedies at law or equity."), together with the difficulty of calculating the damages caused by Maher's continued exploitation Garlock's confidential information and solicitation of its customers, justifies such relief. *See Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632-33 (7th Cir. 2005) (noting that "ongoing competition" is "a sufficient basis" for injunctive relief, even without showing that "particular business has been lost"). Maher's temporary economic hardship and the public's interest in free competition must yield to Garlock's greater interest in obtaining limited protection of its confidential information and client base. *See Reliable Fire Equip.*, 965 N.E.2d at 401 (noting that enforcement of a restrictive covenant is "usually justified on the ground that the employer has a legitimate interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships") (emphasis omitted). And as to Maher's contention that the agreement was not supported by adequate consideration, Doc. 70 at 3-4, Illinois generally regards two years of continued employment as adequate consideration for a restrictive covenant, *see McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1087 (Ill. App. 2015); *Allied Waste Servs. of N. Am., Inc. v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016). Maher was employed for five years after executing the

agreement, which itself recognized that his continued employment constituted "fair and adequate consideration." Doc. 1-3 at 2; Doc. 1 at ¶ 37.

In sum, the court will grant a limited injunction prohibiting Maher, for a period of six months, from directly or indirectly: (a) soliciting or attempting to solicit any customer he serviced as a Garlock employee; and (b) using, disclosing, or transmitting for any purpose confidential information pertaining to Garlock's business that he obtained as a Garlock employee.

### 3. Codes of Conduct

Garlock is not entitled to injunctive relief as to its code of conduct. Doc. 1-4 at 1-3. (Because the Plymouth codes of conduct signed by Garza and Maher are identical, *compare* Doc. 1-4 at 4-7 (Garza), *with id.* at 8-11 (Maher), the court assumes that the Garlock code of conduct signed by Maher, which the complaint does not attach, is materially identical to Garza's, which is.) The reason is plain: the pertinent restrictions in the Garlock code of conduct do not survive termination of Maher and Garza's employment. Doc. 1-4 at 2 (restricting "[e]mployees or members of their families"—depending on the "employee's duties for the Company"—from "own[ing] a significant financial interest in any business that seeks to do business with the Company, or is a competitor of the Company").

The Plymouth code of conduct likewise restricts an employee's participation in "Other Business Interests" only during actual employment. Doc. 1-4 at 5 (prohibiting "[e]mployees or members of their families" from "own[ing] a significant interest in any business … that seeks to do business with the Company, or is a competitor of the Company"). Moreover, as with Garza's non-solicitation agreement with Plymouth, the record does not establish that Garlock is entitled to enforce the Plymouth code of conduct. *See Nat'l Cash Register*, 490 F.2d at 286. As a result, neither code of conduct provides a basis for injunctive relief against Maher and Garza. *See*

*Radiac Abrasives, Inc. v. Diamond Tech., Inc.*, 532 N.E.2d 428, 433 (Ill. App. 1988) ("[A]n employee, absent a restrictive covenant, has a right to enter into competition with the former employer upon leaving such employ … .").

## B.    Damages for Missing Inventory

Garlock seeks in connection with its conversion claim $265,880.21 in damages for the fair market value of the inventory that Maher and Garza misappropriated.  Doc. 23 at 19. Specifically, Garlock seeks: (1) $103,380.21 for the amount that Garlock invoiced Maher in 2017; and (2) $162,499 for what it believes to be the additional inventory shortfall in 2016 and 2017.  *Id*. at 22; Doc. 24 at ¶¶ 9-14; Doc. 24-8 at 2; Doc. 25 at ¶¶ 11-14.  To prove conversion, a plaintiff must show: "(1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership of the property." *Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).  "Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion, plus legal interest."  *Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 956 (N.D. Ill. 2015) (citing *Jensen v. Chi. & W. Ind. R. Co.*, 419 N.E.2d 578, 593 (Ill. App. 1981)).

A plaintiff seeking a Rule 55(b) money judgment must establish damages with "reasonable certainty."  *Catt*, 368 F.3d at 793.  The complaint's well-pleaded allegations establish that Maher and Garza converted Garlock's property by selling its inventory without remitting payment to Garlock.  Doc. 1 at ¶¶ 41-44, 56, 103.  And the evidence adduced by Garlock at the Rule 55(b)(2) stage establishes that it sustained the following damages.

First, Perron confronted Maher about a handwritten inventory list that Garza sent to Maher, reflecting "over $49,000" of inventory, Doc. 24-4, and Maher agreed to pay that amount, Doc. 24 at ¶ 9. Second, Perron obtained from Maher a list of additional missing inventory worth $18,899.80; Garlock invoiced Maher, who agreed to pay for that inventory as well. *Id*. at ¶ 10; Doc. 24-5; Doc. 24-8 at 8. Third, Garlock discovered after the July 2017 inspection of the Bensenville facility that the serial numbers of three additional pieces of missing equipment matched items on CRS invoices that Perron found. Doc. 24 at ¶¶ 11, 13-14; Doc. 25 at ¶¶ 15-17. Two of these items—the Rockers, valued at $26,361.00—had serial numbers matching two Rockers listed on an April 24, 2017 CRS invoice. Doc. 24-7; Doc. 25 at ¶ 15; *see* Doc. 24 at ¶ 11. The other item—the Uniroof, valued at $5,195.00—had a serial number matching a Uniroof listed on another CRS invoice that Perron found. Doc. 24-9; Doc. 24 at ¶ 13. In sum, the record shows that Maher promised to remit $67,899.80 ($49,000 plus $18,899.80) to Garlock for certain inventory, and that Garza and Maher owe Garlock $31,556.00 for the Rockers and Uniroof they took from Garlock and sold through CRS.

Garza and Maher argue that Garlock cannot prevail at this stage on its conversion claim because the pleadings do not establish that it made a demand for the missing inventory. Doc. 70 at 10; Doc. 71 at 6. That argument fails. As an initial matter, Garlock demanded "payment for all missing Garlock inventory" in a letter sent prior to its filing suit. Doc. 1-6 at 4; Doc. 1 at ¶ 51. In any event, a "'demand is unnecessary to establish a conversion where another independent action of conversion is established,'" such as sale of the converted property. *Fortech, L.L.C. v. R.W. Dunteman Co.*, 852 N.E.2d 451, 462 (Ill. App. 2006) (quoting *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1253 (Ill. App. 1990)). Accordingly, even if Garlock's demand were insufficient, Maher and Garza's sale of the inventory, Doc. 1 at ¶¶ 42, 44, is an independent act

of conversion that eliminates the need for a pre-filing demand.  *See Claeys v. Vill. of Brookfield*, 2004 WL 2124621, at *11 (N.D. Ill. Sept. 22, 2004) ("[N]o demand for possession need be shown where some other independent act of conversion can be shown and a demand thus would be futile.").  Maher also contends that Garlock has not established its right to the converted property, Doc. 71 at 6, but the pleadings allege that Defendants sold Garlock's roofing inventory, Doc. 1 at ¶¶ 4, 42-44, 56, which is sufficient.

Garlock cannot at this juncture recover the remainder of its claimed inventory damages.  Most significantly, the record does not show that the additional inventory shortfall of $162,499 had anything to do with Garza's and Maher's unlawful conduct.  *See Wehrs*, 688 F.3d at 892 (holding that causation is necessary to obtain damages under Rule 55(b)).  Garlock's inability to establish causation for those losses also dooms its parallel replevin and unjust enrichment claims.  *See Blanchard & Assocs. v. Lupin Pharm., Inc.*, 900 F.3d 917, 922 (7th Cir. 2018) (holding that "a claim for unjust enrichment requires the plaintiff to show that the defendant[s] retained a benefit to the plaintiff's detriment") (internal quotation marks omitted); *Gates v. Towery*, 435 F. Supp. 2d 794, 801-02 (N.D. Ill. 2006) (noting that a replevin claim requires the plaintiff to show that the defendants possessed the property at issue).  That the amount of missing inventory was substantially greater in 2016 and 2017—when Garza and Maher were operating CRS—than in past years does not establish that they possessed all or even some of the missing inventory.

The court will enter judgment in the amount of $31,556.00 against Maher and Garza for the Rockers and Uniroof, and an additional $67,899.80 against Maher for the amount he agreed to pay Garlock.  The court will also award prejudgment interest at the statutory rate of 5%.  *See Telemark Dev. Grp., Inc. v. Mengelt*, 313 F.3d 972, 986 (7th Cir. 2002) (noting that, under 815 ILCS 205/2, "prejudgment interest is warranted in a conversion action where there has been an

unreasonable and vexatious delay of payment").  Prejudgment interest on the $67,899.80 shall accrue as of August 31, 2017, the date Maher agreed to reimburse Garlock for the second batch of missing inventory.  Doc. 24 at ¶¶ 9-10 (noting that Maher agreed to pay the $18,899.80 on August 31, 2017, but failing to provide a date for Maher's prior agreement to pay "over $49,000"); Doc. 24-8 at 8 (Garlock's August 31, 2017 invoice to Maher).  For the $31,556.00, interest shall accrue as of July 31, 2017, when Perron discovered that the three pieces of equipment were missing and created an invoice for the Rockers.  Doc. 24 at ¶¶ 11, 13 (noting that the invoice for the Rockers was sent to Maher on July 31, 2017 and that the Uniroof was discovered missing during the July 2017 inspection, but failing to note when Garlock demanded payment for the Uniroof); Doc. 24-8 at 7 (Garlock's July 31, 2017 invoice to Maher).

### C.  Damages for Lost Profits

As noted, Garlock seeks $510,773 for the profits it alleges were lost in 2017 due to Garza and Maher's conduct.  Doc. 23 at 19.  A party seeking to recover lost profits damages need not establish that it would have earned the claimed amount "'with absolute certainty.  Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to the defendant's wrongful conduct.'"  *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 199 (Ill. 2002)).  "Normally, an established business is able to satisfy its evidentiary burden by providing data about its past profits."  *Smart Mktg. Grp. Inc. v. Publ'ns Int'l, Ltd.*, 624 F.3d 824, 829 (7th Cir. 2010).  A plaintiff must prove the amount of lost profits and the defendant's causal role to "a reasonable degree of certainty."  *TAS Distrib.*, 491 F.3d at 632.

Garlock supports its lost profits calculation with an affidavit from Peterson setting forth an analysis of its financial data and projections. Doc. 25 at ¶¶ 7-10; Doc. 25-1. Peterson avers that the accounts assigned to Maher suffered a $963,900 decrease in sales from 2016 to 2017, despite Garlock's projection of 5.1% growth in 2017. Doc. 25 at ¶ 7. Peterson does not articulate a basis for this projection or indicate whether Garlock in fact enjoyed 5.1% growth for similarly situated accounts in 2017. Doc. 25-1. Likewise, Peterson provides no basis for his estimate that 38% of the sales to Maher's accounts in 2017 would have been at a 34% markup. Doc. 25 at ¶ 9. Nor does Peterson provide any basis, beyond his own speculation, for why the reduced sales were due to Maher's violation of his legal obligations to Garlock.

Peterson's lost profits analysis does not rest on data sufficient to determine with "reasonable certainty" any lost profits damages. *Smart Mktg. Grp.*, 624 F.3d at 829. As an initial matter, the lack of past financial data regarding Garlock's markup or of a basis for the 2017 projected growth makes it difficult to credit his calculation. *See TAS Distrib.*, 491 F.3d at 633 (cautioning against calculating lost profits based on "speculative, inaccurate or false projections") (internal quotation marks omitted). Moreover, the lack of data from comparable accounts or Garlock's overall performance makes it impossible to determine, at least on this record, whether the sales and profits decrease was due to Garza and Maher's conduct or, rather, other factors specific to Garlock or with the roofing supply market in general. *See Smart Mktg. Grp.*, 624 F.3d at 829 (noting the importance of past profit data in estimating lost profits).

Because Garlock has failed to show with reasonable certainty the lost profits it suffered due to Garza and Maher's conduct, the default judgment will not include lost profits damages.

**D.      Recovery of Compensation Paid to Maher and Garza**

Garlock seeks to recover the compensation it paid to Garza and Maher in 2016 and 2017 based on their fiduciary duty breaches as employees (both) and as an independent sales representative (Maher only).  Doc. 23 at 23.  "Under Illinois law … recovery for a breach of fiduciary duty requires proof of three elements: [1] a fiduciary duty exists, [2] that the fiduciary duty was breached, and [3] that such breach proximately caused the injury of which the plaintiff complains."  *Gross v. Town of Cicero*, 619 F.3d 697, 709 (7th Cir. 2010) (alterations in original) (internal quotation marks omitted).  "It is a fundamental principle of agency law that agents owe fiduciary duties of loyalty to their principals not to (1) actively exploit their positions within the corporation for their own personal benefits; or (2) hinder the ability of the corporation to conduct the business for which it was developed."  *Foodcomm. Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).  "[E]mployees, as agents of their employer," may owe their employer fiduciary duties even if they are not corporate officers.  *Id*. at 304; *see also Mullaney, Wells & Co. v. Savage*, 402 N.E.2d 574, 580 (Ill. 1980) ("This court has held that it is a breach of fiduciary obligation for a person to seize for his own advantage a business opportunity which rightfully belongs to the corporation by which he is employed.").

Under Illinois law, employees who breach their fiduciary duties to their employers may be subject "to complete forfeiture of any salary paid … during the time when [they were] breaching [their] duty to the employer."  *Gross*, 619 F.3d at 712.  "The salary subject to forfeiture is not limited based on the ratio of injurious to legitimate work performed, since an agent who breaches his fiduciary duty has no right to any compensation while acting adverse to the principal's interests.  Forfeiture is limited, however, to the time when the fiduciary was breaching his duty."  *Ibid*. (internal citation and quotation marks omitted); *see also Steinmetz v.*

*Kern*, 32 N.E.2d 151, 154 (Ill. 1941) ("It makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal."). As a result, if Garza and Maher breached their fiduciary duty to Garlock, they are subject to complete forfeiture of compensation paid during the breach.

### 1. Garza

Garza does not dispute that he owed fiduciary duties to Garlock and breached them by forming CRS as a competing enterprise. Even if he disputed the point, the record establishes that Garza, while still a Garlock employee, worked with Maher to form CRS, used Garlock's equipment and facilities to support CRS and solicit customers away from Garlock, and sent Garlock customers CRS invoices for sales of Garlock equipment. Doc. 1 at ¶¶ 39-42, 44; Doc. 24-1. That conduct qualifies as breach of fiduciary duty under Illinois law. *See Foodcomm*, 328 F.3d at 303 (holding that "solicit[ing] the business of a single customer before leaving the company" and "us[ing] the company's facilities or equipment to assist [him] in developing [his] new business" breach an employee's fiduciary duty to his employer); *Radiac Abrasives*, 532 N.E.2d at 434 (Ill. App. 1988) ("An employee is held accountable for breaching his fiduciary duty to his employer only when he goes beyond … preliminary competitive activities and commences business as a rival concern while still employed."). The record further establishes— and Garza does not contest—that Garza's breach extended from July 28, 2016 through the end of his employment in July 2017, and that he was paid $109,306.53 during that time. Doc. 24 at ¶¶ 4-9; Doc. 24-1; Doc. 25 at ¶¶ 6-7, 11, 16-18. Because Garza's breach of his fiduciary duty to Garlock extended throughout this period, Garlock may recover all wages paid him during that time. *See Gross*, 619 F.3d at 712.

In opposing this result, Garza contends that the *complaint* fails to specify the amount owed for his breach. Doc. 70 at 12. That is true, but irrelevant. As explained above, damages for a default judgment are established not in the complaint, but rather by evidence adduced at the Rule 55(b) stage. *See Wehrs*, 688 F.3d at 892. Because Garlock provided such evidence, and because Garza does not contest it, Garlock is entitled to $109,306.53 for its fiduciary duty claim against Garza.

### 2. Maher

Garlock seeks to recover the $3,082.34 in wages it paid Maher from July 28, 2016 through the end of his employment in August 2016. Doc. 23 at 23; Doc. 1 at ¶ 37. However, the complaint alleges that it was only "*following* the termination of Maher's employment with Garlock, while Maher was an exclusive sales representative," that he became involved with CRS. Doc. 1 at ¶ 39 (emphasis added). This sequence is significant, for an employee breaches his fiduciary duties not by merely *planning* to compete with his employer, but only by *entering* active competition. *See Gross*, 619 F.3d at 712 (allowing "complete forfeiture of any salary paid" only when the employee "was breaching his duty to the employer"); *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 994 (Ill. App. 1993) ("[G]eneral employees may plan and outfit a competing corporation, but not commence operation, while still working for the employer … ."); *cf. Mor-Cor Packaging Prods., Inc. v. Innovative Packaging Corp.*, 328 F.3d 331, 335 (7th Cir. 2003) ("[M]erely planning to engage in a transaction that if consummated would create a conflict of interest justifying termination is not itself a breach of contract."). Because the complaint's well-pleaded allegations do not establish that Maher breached his fiduciary duty to Garlock while its employee, Garlock is not entitled to recover the wages it paid Maher as an employee.

Garlock also seeks to recover the $12,534.23 in commissions it paid Maher while he was its independent sales representative operating under the sales representative agreement. Doc. 23 at 23; Doc. 1-5. In general, when a sales "representative is guilty of a mere contractual breach[—]even though it is inconsistent with good faith to the employer[—]it does not forfeit the agent's right to compensation already earned." *Richer v. Khoury Bros., Inc.*, 341 F.2d 34, 38 (7th Cir. 1965). However, when the sales representative, as the company's "agent[]," has engaged in "gross disloyalty," including by retaining "secret profits" at his principal's expense, "complete forfeiture" of commissions is warranted. *Id.* at 38-39. Whether a sales representative is the company's agent, and thus whether he is subject to a forfeiture remedy for breach of fiduciary duty, depends on whether the company "has the right to control the manner and method in which work is carried out … and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (internal quotation marks omitted).

Here, the record shows that Maher, while a Garlock sales representative, had the authority to bind Garlock to sales of its products and that Garlock exercised control over his sales activities by demanding exclusivity and constraining the geographic area in which he worked. Doc. 1 at ¶¶ 37-38, 43-44; Doc. 1-5 (providing that Maher "can generate sales in Garlock Chicago sales territory," that he would "sell lines currently in the Garlock Chicago product catalog **exclusively**," and would place purchase orders for Garlock to fulfill). Garlock also entrusted Maher with its confidential information, including customer lists and leads. Doc. 1 at ¶¶ 17-20; *see Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 871 (N.D. Ill. 2006) (in concluding that the employee was the company's agent, noting that he had access to "confidential information such as customer lists" and "the authority to sell

and distribute" as well as to "place orders[] for" the company's products).  Given these circumstances, Maher acted as Garlock's agent and thus was, "by definition[,] in a fiduciary relationship" with Garlock.  *R.K. Ray Sales, Inc. v. Genova, Inc.*, 478 N.E.2d 616, 619 (Ill. App. 1985); *see also Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) ("A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith … .").

Maher retorts that Illinois law requires highly specific pleadings to establish a fiduciary relationship.  Doc. 71 at 7-8.  That argument fails, as federal pleading standards, not Illinois standards, govern this issue.  *See Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 n.5 (7th Cir. 2015) (holding that federal notice pleading standards, not the "clear and convincing" pleading requirement that Illinois applies to fiduciary relationships, govern in diversity actions) (internal quotation marks omitted).  As a result, Garlock needed only to "plead facts that plausibly stated a claim for relief arising out of [Maher's] breach of a fiduciary duty," *ibid.*—and by pleading that Maher profited from supporting a direct competitor while serving as Garlock's exclusive sales representative, Doc. 1 at ¶¶ 37-44, 56, 59, Garlock met its burden.

Maher also contends that the fiduciary claim should be dismissed because it is duplicative of the contract claim.  Doc. 71 at 8-9.  However, because those claims are "comprised of different elements"—the fiduciary duty claim requires the existence of a fiduciary relationship, while the contract claim does not—Garlock may pursue both claims, even if it ultimately is entitled only to singular damages.  *See Gritters v. Ocwen Loan Servicing, LLC*, 2014 WL 7451682, at *10 (N.D. Ill. Dec. 31, 2014) (observing that cases dismissing fiduciary claims as duplicative of contract claims are limited to the malpractice context) (citing *Hoagland ex rel.*

*Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004)).

Like an employee, "an agent who breaches is fiduciary duty has no right to any compensation while acting adverse to the principal's interests." *Gross*, 619 F.3d at 712. The record shows that, during the relevant time frame, Garlock paid Maher $12,534.23 in commissions. Doc. 1 at ¶ 39; Doc. 25 at ¶ 18. Maher does not dispute this amount. Accordingly, Garlock is entitled to recover $12,534.23 from Maher on its fiduciary duty claim.

Garlock seeks prejudgment interest on the sums owed for this claim. Doc. 23 at 23. "Generally, prejudgment interest is not recoverable absent a statute or agreement providing for it." *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 933 (7th Cir. 2002) (Illinois law) (internal quotation marks omitted). Garlock cites no authority allowing an award of prejudgment interest for the fiduciary duty claim, thereby forfeiting the point for purposes this motion. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (internal quotation marks omitted).

E.      **Attorney Fees**

Garlock seeks to recover its attorney fees, but provides no legal support for its request. Doc. 23 at 31. Accordingly, Garlock's request is forfeited for purposes of its Rule 55(b) motion. *See Windy City Metal Fabricators & Supply*, 536 F.3d at 668 n.3.

**Conclusion**

Garlock's motion for default judgment is granted in part and denied in part. A default judgment shall enter in favor of Garlock in the amount of $67,899.80 against Maher, with prejudgment interest accruing at 5% from August 31, 2017; $109,306.53 against Garza, with no

prejudgment interest; $31,556.00 against Maher and Garza, jointly and severally, with prejudgment interest accruing at 5% from July 31, 2017; and $12,534.23 against Maher, with no prejudgment interest.  A default judgment also shall enter against CRS in the amount of $901,526.31, with prejudgment interest accruing only on $265,880.21, the amount of converted property, at a rate of 5% from December 31, 2017, the end of the month when the last missing inventory was discovered.  Doc. 25 at ¶ 13.  Because the amount owed by CRS includes the sums owed by Maher and/or Garza, those sums are owed jointly and severally with CRS.  To the extent the court has denied Garlock's Rule 55(b) request for certain damages against Maher and Garza, Garlock may seek those damages in the ordinary course at summary judgment and/or at trial.

In addition, Garlock is entitled to an injunction, extending six months from the date of this order, prohibiting Maher from directly or indirectly: (a) soliciting or attempting to solicit any customer he serviced as a Garlock employee; and (b) using, disclosing, or transmitting for any purpose confidential information pertaining to Garlock's business that he obtained as a Garlock employee.

September 28, 2018

_____
United States District Judge